Mr. & Mrs. P. v. West Hartford Bd. Of Educ.

# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

_____

August Term, 2017

Argued:  November 7, 2017          Decided: March 23, 2018

Docket No. 16-3618-cv

_____

MR. P AND MRS. P, ON THEIR OWN BEHALF AND AS NEXT FRIENDS OF M.P.,

*Plaintiffs–Appellants*,

—v.—

WEST HARTFORD BOARD OF EDUCATION, THOMAS MOORE, SUPERINTENDENT, WEST HARTFORD PUBLIC SCHOOLS, IN HIS OFFICIAL CAPACITY, GLENN MCGRATH, DIRECTOR OF PUPIL SERVICES, WEST HARTFORD PUBLIC SCHOOLS, IN HIS OFFICIAL CAPACITY,

*Defendants-Appellees*,

ESSIE S. LABROT, TOWN CLERK, IN HER OFFICIAL CAPACITY,

*Defendant*.

_____

Before: LIVINGSTON AND CHIN, <u>Circuit Judges</u>, and KOELTL, <u>District Judge</u>.*

The parents of a student with an emotional disturbance brought this action against the student's school district, claiming that the school district violated procedural requirements, provided an inadequate individualized education program (IEP) for more than two school years, and offered an inadequate IEP for a third year, which denied the student a free appropriate public education (FAPE) under the Individuals with Disabilities Education Act (IDEA). The District Court for the District of Connecticut, Vanessa L. Bryant, <u>J.</u>, held that the school district provided and offered the student a FAPE at all times and that any procedural violations did not entitle the parents to any relief. The parents appealed. Because we agree with the district court, we affirm the district court's judgment.

---------------

COURTNEY P. SPENCER, Middletown, CT, <u>for plaintiffs-appellants</u>.

SUSAN C. FREEDMAN, (Peter J. Murphy and Peter J. Maher, <u>on the brief</u>), Shipman & Goodwin LLP, Hartford, CT, for <u>defendants-appellees</u>.

---------------

---

* Judge John G. Koeltl of the United States District Court for the Southern District of New York, sitting by designation.

John G. Koeltl, District Judge:

The plaintiffs-appellants, Mr. and Mrs. P. (the "parents"), commenced this action in the United States District Court for the District of Connecticut (Bryant, J.) on behalf of themselves and their son, M.P., against the defendants-appellees, the West Hartford Board of Education (the "District" or the "Board") and two District officials in their official capacities,[2] alleging claims under the Individuals with Disabilities Education Act (the "IDEA"), as amended, 20 U.S.C. § 1400 et seq. The parents appeal the district court's denial of their motion for summary judgment and the grant of the District's cross-motion for summary judgment.

In December of his sophomore year at Hall High School in West Hartford, Connecticut ("Hall" or the "school"), M.P. began having suicidal and homicidal

---

[2] The district court dismissed without prejudice Thomas Moore, Superintendent of West Hartford Public Schools, and Glenn McGrath, Director of Pupil Services for West Hartford Public Schools, as defendants because the parents did not allege any causes of action against those defendants in their individual capacities. Mr. & Mrs. P. ex rel. M.P. v. W. Hartford Bd. of Educ., No. 14-cv-1697, 2016 WL 5660389, at *1 (D. Conn. Sept. 29, 2016). The parents do not argue that the district court erred in dismissing Messers. Moore and McGrath. An additional defendant, Essie S. Labrot, Town Clerk, in her official capacity, was terminated as a defendant when the plaintiffs failed to name her in the Second Amended Complaint.

ideations and was ultimately diagnosed with High Functioning Autistic Spectrum Disorder/Asperger's Syndrome; a Processing Disorder -- Predominantly Nonverbal LD and Executive Subtype; and Psychotic Disorder -- Not Otherwise Specified. At the end of January 2012, the District approved accommodations for M.P. pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, including counseling, but did not make a determination that M.P. was eligible for special education and related services pursuant to the IDEA.[3] In March 2012, the parents requested special education for M.P. In June 2012, after the District had received psychological and psychiatric reports for M.P., the District enrolled M.P. in a special education program for his junior and senior years. The special education program tracked Hall's graduation requirements, and M.P. graduated from that program on time.

---

[3] Section 504 of the Rehabilitation Act of 1973 prohibits discrimination on the basis of a person's disability. While a plaintiff may assert a claim under Section 504 in conjunction with a claim under the IDEA, the scopes of the two statutes are different, and proving a violation of Section 504 of the Rehabilitation Act requires showing, among other things, that the defendants acted with bad faith or gross misjudgment in the administration of disability services. See C.L. v. Scarsdale Union Free Sch. Dist., 744 F.3d 826, 840-41 (2d Cir. 2014). The parents do not allege a violation of Section 504 in this case.

Toward the end of M.P.'s senior year, the parents disputed the District's proposed post-secondary special education plan and requested two years of compensatory education for M.P. in a private program. The District rejected the parents' request. The parents then challenged the District's treatment of M.P. beginning with M.P.'s sophomore year, before M.P. was enrolled in special education, through the school's rejection of the parents' proposed post-secondary program upon M.P.'s graduation.

After a seven-day hearing, a Due Process Hearing Officer (a "Hearing Officer" or an "IHO") principally denied the parents' challenge, and the district court affirmed the IHO's decision. On appeal, the parents argue that the judgment of the district court should be reversed because the District violated the IDEA's procedural safeguards, denying the parents an opportunity to participate in formulating M.P.'s special education program and depriving M.P. of educational benefits, and because the District deprived M.P. of the free appropriate public education ("FAPE") required by the IDEA.

This case requires us in particular to determine the appropriate standards to be applied in determining whether a school district has acted with sufficient expedition in identifying a student entitled to special education and related

5

services and in providing such education and services. It also requires us to apply the Supreme Court's recent decision in <u>Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1</u>, 137 S. Ct. 988 (2017), to determine whether the special education and related services provided to M.P. were sufficient to provide him with a FAPE consistent with the IDEA.

For the reasons explained below, the judgment of the district court is **AFFIRMED**.

## I.

The IDEA requires States receiving federal funds to provide "all children with disabilities" with a FAPE. 20 U.S.C. § 1412(a)(1)(A); <u>see</u> <u>Gagliardo v. Arlington Cent. Sch. Dist.</u>, 489 F.3d 105, 107 (2d Cir. 2007); <u>Walczak v. Fla. Union Free Sch. Dist.</u>, 142 F.3d 119, 122 (2d Cir. 1998). A FAPE must provide "'special education and related services' tailored to meet the unique needs of a particular child, 20 U.S.C. § 1401[9], and be 'reasonably calculated to enable the child to receive educational benefits,' [<u>Bd. of Educ. v. Rowley</u>, 458 U.S. 176, 207 (1982)]." <u>Walczak</u>, 142 F.3d at 122. "[R]elated services" include "transportation, and such developmental, corrective, and other supportive services . . . as may be

6

required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26)(A); see Rowley, 458 U.S. at 188.

The IEP is "the centerpiece of the [IDEA's] education delivery system for disabled children." Endrew F., 137 S. Ct. at 994 (quoting Honig v. Doe, 484 U.S. 305, 311 (1988)). "The IEP, the result of collaborations between parents, educators, and representatives of the school district, 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'" Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 297 F.3d 195, 197 (2d Cir. 2002) (Sotomayor, J.) (quoting Honig, 484 U.S. at 311). "Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." Endrew F., 137 S. Ct. at 999.

Thus, Connecticut must deliver each disabled child a FAPE pursuant to the child's IEP. See id. at 993-94. Connecticut accomplishes this through its State Department of Education and the Board of Education for each school district in the State, each of which is responsible for developing an IEP for disabled

7

children in its district. See 20 U.S.C. §§ 1401(19)(A), (32); Conn. Agencies Regs.

§ 10-76d-11; Doe v. E. Lyme Bd. of Educ., 790 F.3d 440, 448 n.4 (2d Cir. 2015).

The IDEA also provides a variety of procedural safeguards for the parents

of disabled children. See Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ., 397

F.3d 77, 81-82 (2d Cir. 2005). Parents may challenge a proposed IEP by filing a

complaint with the state education agency, which is resolved through an

"impartial due process hearing." 20 U.S.C. §§ 1415(b)(6), (f); see Walczak, 142

F.3d at 122; see also Conn. Gen. Stat. § 10-76h. Generally, the party seeking relief

bears the burden of persuading an IHO of the IEP's impropriety. Schaffer ex rel.

Schaffer v. Weast, 546 U.S. 49, 62 (2005).[4] A party aggrieved by the decision of an

IHO may challenge that decision in a federal district court. 20 U.S.C. § 1415(i)(2).

---

[4] In Connecticut, the party who filed for due process, in this case the parents, has the burden of going forward with the evidence, but the public agency has the burden in all cases of proving the appropriateness of the IEP. Conn. Agencies Regs.  10-76h-14(a). In Schaffer, the Supreme Court left open the question whether the States could always place that burden on school districts, even in cases where a parent seeks to challenge an IEP. See 546 U.S. at 61-62. However, nothing in this case turns on which party bore the burden of persuasion in the state administrative proceeding because that issue would only be relevant if the evidence were in equipoise. See id. at 55, 58. That is not the case here.

**II.**

M.P., now 21 years old, attended public schools in West Hartford, Connecticut. M.P. has a Full Scale IQ of 108, which is in the upper limits of the "average" range. Special App. 3. Although M.P. had a history of awkward social interactions with peers, M.P.'s education progressed steadily, and M.P. earned average to above average grades until midway through his sophomore year at Hall.

In December 2011, Mrs. P. discovered that M.P. was receiving "D" grades in all of his classes. When Mrs. P. confronted M.P. about his grades, M.P. expressed suicidal ideations. Mr. and Mrs. P. called M.P.'s pediatrician, who recommended taking M.P. to the Connecticut Children's Medical Center (the "CCMC"). M.P. had a pocketknife with him when he arrived at the CCMC, which was confiscated by hospital staff. Upon learning that the pocketknife would not be returned to him, M.P.'s reaction resulted in a referral to the Institute of Living (the "IOL"), where he remained overnight for observation.

Mrs. P. notified Hall of M.P.'s hospitalization and suicidal ideation. On December 8, 2011, the school convened a Student Assistance Team/Child Study Team Meeting, which Mr. and Mrs. P. attended, along with four of M.P.'s

9

teachers, a school counselor, a school administrator, and an assistant principal. Although M.P. was failing five of seven classes at that point, the meeting minutes observed that M.P. "is very humorous," "has a lot of friends and . . . is on the swim team," and "has high ability but his effort is up and down." Appellants' App. ("A.A.") 575. The school agreed to make accommodations "due to the extenuating circumstances," such as excusing M.P.'s absences from class and allowing him to drop a course without penalty. Id. The parents were to provide the school with M.P.'s discharge report from the IOL and confer with M.P.'s pediatrician about having M.P. assessed for Attention Deficit Disorder ("ADD").

M.P. began seeing a private Licensed Clinical Social Worker in 2011. At some point, although it is not clear when these discussions took place, M.P. expressed to the social worker a desire to kill his former psychiatrist and discussed blowing up a hospital and attacking people at school.

On January 31, 2012, the school convened a meeting pursuant to Section 504 of the Rehabilitation Act of 1973 (a "504 Review Meeting"). See 29 U.S.C. § 794; 34 C.F.R. §§ 104.31-104.39. The meeting minutes reflect that M.P. had been diagnosed with Attention Deficit with Hyperactivity Disorder ("ADHD") by his parents' private doctor, Dr. Scherzer, on January 13, 2012. At the 504 Review

Meeting, it was determined that M.P. qualified for Section 504 accommodations but did not qualify for special education under the IDEA. The meeting resulted in a Student Accommodation Plan, which identified the relevant concern for M.P. as "difficulties with concentration and organization." A.A. 343. As part of M.P.'s Accommodation Plan, Hall teachers were allowed to give M.P. a "P" if M.P. was attaining less than a "C" in a class and were permitted to excuse any late work. M.P. was also provided with access to a "[r]esource study hall" and assigned a counseling intern. A.A. 343; Special App. 5.

Hall officials and M.P.'s parents met three more times after the January 31, 2012, 504 Review Meeting as part of a planning and placement team (a "PPT") process before M.P. was found eligible for special education on June 11, 2012. During this time, M.P. was also evaluated by a psychologist and had a consultation with a psychiatrist to determine whether and to what degree M.P. required further accommodations or special education.

In March 2012, the parents referred M.P. for special education after M.P. had stopped attending school altogether in February 2012. When M.P. stopped attending school, M.P.'s psychiatrist spoke to the school, and the school arranged homebound tutoring. Also in March 2012, M.P. took the Connecticut Academic

11

Performance Test (the "CAPT"), a state-wide requirement for high school graduation. M.P. did not complete the test, and his score was reported as blank.

The PPT met on March 12, 2012 to review the parents' referral and observed that M.P. had been struggling with "severe anxiety and school refusal," but that his parents "reported that medications are beginning to be helpful to [M.P.]." A.A. 345. The PPT concluded that because M.P. had not been experiencing his difficulties "over a long period of time," M.P. did not qualify for special education. Id. However, the team kept M.P.'s Section 504 accommodations in place.

On April 23, 2012, the PPT met again to review the parents' referral for special education. At the time, M.P. was hospitalized at St. Francis Hospital "due to emotional concerns." Id. at 348. The parents reported that M.P. had been having "aggressive thoughts," which had caused his psychologist to call the West Hartford police. Id. The PPT increased M.P.'s homebound tutoring to eight hours per week. The school asked that the parents and M.P.'s teachers complete behavioral checklists and recommended a consultation by the District's psychiatrist, Dr. Black. The PPT also noted that M.P.'s private psychiatrist had so far refused to release his evaluation to the school and that the parents were

12

withholding signing a release, presumably for those records, "until they have a better understanding of what is going on with [M.P.]" Id. The school requested that the parents and M.P.'s clinicians share any education-related information with the school. The PPT planned to meet again when the new evaluations were complete.

On May 9, 2012, the District's psychologist evaluated M.P. and administered the Behavior Assessment System for Children 2nd Edition ("BASC-II"), an "integrated system designed to assess a variety of emotional and behavior issues." Id. at 351. Based on M.P.'s self-reporting, the psychologist placed M.P. in the "At-risk" range for Hyperactivity and in the "Clinically Significant" range for Personal Adjustment relating to a poor relationship with his parents. Id. M.P. reported "having no more unusual thoughts or perceptions, no more anxiety based feelings and no more depressed feelings than others his age." Id. Based on M.P.'s psychiatric diagnoses and refusal to attend school, the District's psychologist recommended that "the PPT explore the possibility of a special education mandation under the category of Emotional Disturbance." Id. at 352.

The next day, May 10, 2012, Dr. Black, the District's psychiatrist, conducted a psychiatric consultation with M.P. Dr. Black described M.P. as a "[v]ery capable . . . tall, friendly, husky, articulate young man with good eye contact," but reported that last semester M.P. "shut down." Id. at 353-54. During the interview, M.P. told Dr. Black that "he never wanted to kill anyone or himself." Id. at 354. Dr. Black noted that "[w]hile it is not the function of this consultation to make a psychiatric diagnosis, it is probable that [M.P.] would meet the DSM IV Axis I criteria for a Reactive Attachment Disorder and an Asperger's Disorder." Id. at 355. Dr. Black recommended that M.P. return to school, noting that "[i]f necessary, he can return, at least initially, to the STRIVE program, and as time progresses, a determination can be made as to whether he should remain in STRIVE or become part of the mainstream." Id. Dr. Black recommended that M.P. continue his current psychotropic medication.

STRIVE, which stands for Success Through Responsibility Initiative Vision Education, is an alternative high school program that includes the necessary academic courses to meet the District's graduation requirements, with certain modifications. STRIVE employs a data-driven behavior management system

14

whereby students earn privileges by demonstrating appropriate behavior. All students enrolled at STRIVE have some form of disability.

One week after Dr. Black's evaluation, on May 17, 2012, the PPT met to review his recommendations and determine M.P.'s program for the remainder of the school year. Because the school year was almost over, the PPT recommended that M.P. continue homebound tutoring through the end of his sophomore year. The PPT noted that, while M.P. was "doing well with tutoring," the tutoring had been "inconsistent on the part of the tutor," and that the District would provide compensatory tutoring to make up for time missed. Id. at 357. The PPT also noted that the school had not yet received any private evaluations of M.P., and that the PPT would meet again on June 11, 2012, "to address [M.P.'s] progress and determine [eligibility]." Id.

At the June 11 meeting, the PPT determined that M.P. was eligible for special education under the primary disability of "Emotional Disturbance." Id. at 358. The team decided to continue M.P.'s homebound tutoring at eight hours per week until M.P. completed the tenth grade curriculum, and the team scheduled a meeting the following week to determine M.P.'s special education program for the next school year.

The PPT met again on June 19, 2012 and determined that M.P. should attend STRIVE for the 2012-2013 school year. STRIVE's principal attended the meeting "to gain a better understanding of [M.P.'s] challenges," and to explain the STRIVE program to the parents. Id. at 375.

On July 13, 2012, Dr. Isenberg, a private pediatric neuropsychologist, conducted a neuropsychological evaluation of M.P. Dr. Isenberg diagnosed M.P. with High Functioning Autistic Spectrum Disorder/Asperger's Syndrome, Processing Disorder -- Predominately Nonverbal LD and Executive Subtype, and Psychotic Disorder -- Not Otherwise Specified. In Dr. Isenberg's view, M.P. was "not emotionally stable enough to return to a mainstream learning environment" and required "a more self-contained therapeutic learning environment." Id. at 402. While Dr. Isenberg noted that there were "many elements of the STRIVE program that would be beneficial, including access to a more contained environment, access to increased structure/supervision, behavior support, and counseling service," he also expressed "some concern that [M.P.] will require a more specialized therapeutic program," such as one offered at the IOL, where M.P. had been hospitalized. Id.

On September 20, 2012, the PPT met to "review [M.P.'s] progress at STRIVE and review a [neuropsychological] evaluation administered by Dr. Isenberg." Id. at 408. The PPT noted that M.P. had "made a positive transition" to STRIVE. Id. As of that meeting, M.P. was receiving thirty-one hours of special education and roughly five hours of counseling per week. The PPT decided to keep M.P. enrolled at STRIVE.

In March 2013, M.P. again took the state-wide CAPT. This time, M.P. completed the test, scoring Proficient in math and reading and Goal in science and writing.

The PPT met again on May 22, 2013 to conduct an annual review of M.P.'s junior year at STRIVE. Although M.P.'s special education teacher and social worker at STRIVE and his guidance counselor from Hall attended the meeting, no regular education teacher from Hall was present. The IEP prepared at the May 22 meeting observed that M.P. "is very respectful and polite. He has a great sense of humor. He has demonstrated the ability to turn things around, especially in regard to attendance, but more importantly has been open to seeing things with a different perspective. [M.P.] is ready to attend Hall part time next year." Id. at 432. However, the IEP also noted that M.P. "can be inappropriate

17

with his comments at times. He is very concrete in his thinking and does not always pick up on social cues. He has connected with peers here, but sometimes makes inappropriate comments to be humorous and try to fit in." Id.

At the time, M.P. had close to a 3.0 GPA, consisting of mostly "As" and "Bs." The PPT noted that M.P. had "mastered most of [his] academic and social and behavioral goals/objectives," and that his "attendance has improved significantly since entering [STRIVE]." Id. at 428. The PPT planned a split schedule for M.P. during his senior year, where he would begin each day with classes at Hall and then return to STRIVE in the afternoon for lunch, more classes, and group counseling. The District was to provide transportation. The PPT decided that M.P. did not require programming during the summer between his junior and senior years. While the parents attended the May 22 meeting, the IEP developed at the meeting was not sent to them until November 2013.

M.P. had difficulty transitioning back to Hall for his senior year. M.P. had several unexcused or unverified absences in September and October 2013. On October 22, 2013, M.P. got upset when a guidance counselor questioned him about skipping class, and he threatened to leave the school and not return. M.P.

18

ultimately agreed to walk to STRIVE and meet with Mr. Davis, the principal, and Mr. Volpe, his teacher, who were able to "de-escalate [M.P.'s] behavior." Id. at 443.

In light of these issues, the PPT met on October 28, 2013 to reassess M.P.'s IEP. M.P. expressed a desire to return to STRIVE full time, which the PPT recommended, and the IEP was amended to implement this recommendation. The October 28 IEP also noted M.P.'s interest in starting his own landscaping business and attending community college. The IEP included goals and objectives keyed toward finding and maintaining employment that would match M.P.'s vocational strengths and weaknesses.

On November 26, 2013, after M.P. had returned to STRIVE full time, the parents e-mailed several STRIVE staff members and said that they realized "that Strive is not the ideal environment for [M.P.,] but[] it has assisted him in many ways and for that we are grateful." Supp. App. of Def.-Appellee ("Supp. App.") 20. The parents told the staff members that "[i]t has been a huge relief to [M.P.] to be back [in] an environment where he feels more comfortable." Id.

On December 13, 2013, M.P. was suspended from STRIVE for three days and arrested for punching a fellow male student in defense of a female student.

M.P. returned to STRIVE six days later. M.P. apologized, and the STRIVE staff "didn't deem [him] to be any kind of threat to the kid." Supp. App. 404. Mr. Davis testified that this was the only time M.P. had ever acted out physically at STRIVE. Id. at 405.

The PPT met on February 4, 2014 to discuss changes to M.P.'s IEP and M.P.'s transition for the 2014-2015 school year. The parents' attorney attended the meeting, and the parents excused the presence of a regular education teacher from Hall. M.P. appeared to rebound from the December 13 episode, and at the meeting he had a 98% on STRIVE's behavioral intervention system. The PPT also noted that M.P. was an "excellent participant in group problem-solving." A.A. 451. In response to an inquiry by the parents' attorney about vocational training, the Transition Coordinator reported that M.P. had accessed "CAVE"[5] to practice job applications, resume and cover letter writing, and career research, and had taken multiple trips to community colleges.

---

[5] CAVE is the Career and Vocational Education class, which "allow[s] [students] to apply for jobs, take on supervised, part-time work, engage with guest speakers about different careers, and develop a list of goal career options." Mr. & Mrs. P., 2016 WL 5660389, at *12 n.7.

20

At the meeting, the District made a detailed recommendation for M.P.'s IEP for the remainder of his senior year, which included academic classes, counseling, public transportation training, one-on-one training with a job coach, vocational training and a list of potential job sites, daily monitoring by a job coach, after-school tutoring with a special education teacher, and continued participation in athletics and extracurricular activities at Hall, where M.P. had participated in the wrestling team since his junior year. For the summer after M.P.'s senior year and the following school year, the District's recommendations included counseling, continued public transportation training, part- or full-time employment at a job site with the support of a job coach, bi-weekly meetings with the Transition Coordinator, self- and third-party assessments, and afternoon tutoring with a special education teacher.

The parents rejected the District's recommendations and instead requested an out-of-district placement at Options, a comprehensive vocational training program, for the remainder of the school year, as well as two years of compensatory education at Options.[6] The District declined the parents' request

---

[6] Options is a private special education program in Hartford, Connecticut. Staff members at Options work one-on-one with students at job sites in the community or at a community college. Academic needs are addressed in a

because it believed it could provide M.P. with a FAPE through its recommended program.

On March 24, 2014, the parents requested a Special Education Due Process Hearing. See 20 U.S.C. § 1415(f).

On May 22, 2014, M.P. was hospitalized for about one week after he walked out of his house with a kitchen knife and made homicidal statements toward his former psychiatrist. The psychiatric intake evaluation noted that M.P. denied suicidal ideation and had not displayed any aggressive behavior since arriving at the hospital, other than his statements about hurting his former psychiatrist.

The PPT met again on June 2, 2014, for an annual review. The PPT determined that M.P. had met the course requirements for graduation. At the meeting, the District modified its previous recommendation and proposed that M.P. join a post-secondary program called ACHIEVE. The school-based aspect of ACHIEVE is located in the same building as STRIVE. Progress at ACHIEVE is tracked through individualized Community Based Situational Assessments and

one-on-one setting, rather than a setting with multiple students, and Options provides private transportation in its own vehicles.

22

Skills Assessments. At ACHIEVE, M.P. would work three-to-four days per week at a work site in the community, have the opportunity to attend community college in the second semester, receive individual and group counseling, and have a one-on-one job coach. The District also recommended that M.P. join a program during the summer of 2014 that included half-day work experiences with a one-on-one job coach four-to-five days per week. The Hearing Officer found that, while transportation was to be provided for these programs, "the specific nature of the transportation was not identified, nor was it clear whether transportation [was] to be provided only to and from the program or also within the program day." Special App. 10.

The parents rejected the District's recommendation and renewed their request for two years of compensatory education at Options. The District again declined the parents' request.

In June 2014, M.P. graduated from STRIVE. That same day, Mrs. P. and M.P. spoke briefly with a paraprofessional at ACHIEVE and looked into an ACHIEVE classroom. However, M.P. did not participate in ACHIEVE's orientation program.

23

The Special Education Due Process Hearing requested by the parents on March 24, 2014 convened over seven non-consecutive days between June 9, 2014 and August 26, 2014. On October 2, 2014, the Hearing Officer issued a Final Decision and Order. The Hearing Officer found that the District had provided M.P. with a FAPE at all times between March 24, 2012 and June 2014, when M.P. graduated from STRIVE.[7] However, the Hearing Officer concluded that the District's proposed program for the summer of 2014 and the 2014-2015 school year at ACHIEVE was inappropriate and required modifications "only with regards to the ACHIEVE program's emphasis on public transportation training." Id. at 17. The Hearing Officer directed the District to provide M.P. with transportation to and from ACHIEVE, as well as between ACHIEVE and job sites, "until such time as the PPT meets and determines that [M.P.] is fully acclimated to the ACHIEVE program, is ready emotionally to begin bus-training and no longer needs private transportation." Id. The Hearing Officer rejected the

---

[7] As discussed further below, a Due Process Hearing is limited to complaints about actions that the complainant knew of or should have known of within two years of the date that the hearing is requested. See 20 U.S.C. § 1415(f)(3)(C); Conn. Agencies Regs. 10-76h-4. Therefore, the Appellants' claims are limited to events within the two-year period preceding March 24, 2014, the day on which they requested the Due Process Hearing.

parents' procedural arguments, concluding that while the District had committed certain procedural violations, none denied M.P. educational benefits or denied the parents a meaningful opportunity to participate in the decision-making regarding M.P.'s education.

On November 14, 2014, the parents filed a complaint in the District Court for the District of Connecticut appealing the Hearing Officer's Final Decision and Order in its entirety. In a September 29, 2016 Memorandum Opinion, the district court denied the parents' motion for summary judgment and granted the District's cross-motion for summary judgment in full. Mr. & Mrs. P., 14-cv-1697, 2016 WL 5660389, at *15 (D. Conn. Sept. 29, 2016).

This appeal followed.

## III.

We engage in a "circumscribed de novo review of a district court's grant of summary judgment in the IDEA context because the responsibility for determining whether a challenged IEP will provide a child with a FAPE rests in the first instance with administrative hearing and review officers." M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ., 725 F.3d 131, 138 (2d Cir. 2013) (internal quotation marks and brackets omitted). "Accordingly, our de novo review only seeks to

independently verify that the administrative record supports the district court's determination that a student's IEP was adequate." Id.

"[F]ederal courts reviewing administrative decisions must give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" Gagliardo, 489 F.3d at 113 (quoting Rowley, 458 U.S. at 206, 208 (alteration in original)). Deference to the administrative decision is particularly appropriate when the administrative officer's review has been thorough and careful, and when the court's decision is based solely on the administrative record. See M.H. v. New York City Dep't of Educ., 685 F.3d 217, 241 (2d Cir. 2012). While this Court "do[es] not simply rubber stamp administrative decisions," Walczak, 142 F.3d at 129, review of the administrative decision "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review," Rowley, 458 U.S. at 206.

On appeal, the parents argue that the decisions of the Hearing Officer and the district court should be reversed because the District committed procedural violations, failed to provide M.P. with a FAPE from March 24, 2012, through June

26

2014, and because the District's proposed post-secondary program would not provide M.P. with a FAPE after he graduated from high school. Our review is therefore two-fold: First we must determine if the District has complied with the IDEA's procedural requirements. Rowley, 458 U.S. at 206. Second, we must determine whether the IEPs at issue are "reasonably calculated to enable [the] child to make progress appropriate in light of the child's circumstances." Endrew F., 137 S. Ct. at 1001.

**A.**

The parents contend that the district court erred in upholding the Hearing Officer's rejection of the majority of the parents' procedural challenges and in holding that any procedural violations that did occur did not entitle the parents to relief.

A procedural violation of the IDEA entitles a plaintiff to relief only if it: "(I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii); see A.M. v. N.Y.C. Dep't of Educ., 845 F.3d 523, 535 (2d Cir. 2017). "That is, parents must articulate how a procedural

27

violation resulted in the IEP's substantive inadequacy or affected the decision-making process." M.W., 725 F.3d at 139. However, "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not." R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 190 (2d Cir. 2012).

In this case, the parents argue that the District committed the following procedural violations: (i) waiting too long to identify M.P. as eligible for special education; (ii) conducting an inadequate evaluation of M.P.; (iii) providing insufficient homebound tutoring during M.P.'s sophomore year of high school; (iv) failing to consider the evaluation from the parents' private psychiatrist; (v) providing inaccurate IEPs; (vi) failing to have a regular attendance teacher from Hall at the May 22, 2013 PPT meeting; (vii) failing to provide the parents with the IEP from the May 22, 2013 PPT meeting until six months after the PPT meeting; and (viii) failing to disclose the specific qualifications of the paraprofessionals who would be working with M.P. at ACHIEVE.

The Hearing Officer concluded that the District identified M.P. as a student eligible for special education with sufficient expedition, and that the District provided appropriate evaluations and transition planning. While the

Hearing Officer found that the District drafted inaccurate and incomplete IEP documents and provided inconsistent programming, the Hearing Officer concluded that "neither of these violations operated to deny [M.P.] an educational benefit or deny Parents a meaningful opportunity to participate." Special App. 17. The district court differed from the Hearing Officer's conclusions only in that it found that the District's delay in providing the parents with the May 22, 2013 IEP was a procedural violation and found that the District's failure to provide the qualifications of the paraprofessionals that would be working with M.P. also may have been a procedural violation.[8] Mr. & Mrs. P., 2016 WL 5660389, at *10. However, the district court concluded with respect to both violations that they did not deny M.P. educational benefits or a FAPE or deny the parents a meaningful opportunity to participate in the decision-making process. Id.

---

[8] The district court found that failing to provide the paraprofessionals' qualifications did "not require reversal," and that "[e]ven if the Board wrongfully withheld information about the paraprofessionals' qualifications, doing so is not symptomatic that ACHIEVE was not a substantively appropriate program." Mr. & Mrs. P., 2016 WL 5660389, at *10.

29

The parents argue that the District violated the "Child Find" obligation under the IDEA by failing to identify M.P. promptly as eligible for special education.

The "Child Find" obligation requires each State to have policies and procedures to ensure that all children with disabilities are identified and evaluated for special education and related services. 34 C.F.R. § 300.111(a)(1)(i)-(ii). The obligation extends to all children suspected of having a disability requiring special education, "even though they are advancing from grade to grade." Id. § 300.111(c)(1). However, "Child Find does not demand that schools conduct a formal evaluation of every struggling student." D.K. v. Abington Sch. Dist., 696 F.3d 233, 249 (3d Cir. 2012) (citing J.S. v. Scarsdale Union Free Sch. Dist., 826 F. Supp. 2d 635, 663 (S.D.N.Y. 2011); A.P. ex rel. Powers v. Woodstock Bd. of Educ., 572 F. Supp. 2d 221, 226 (D. Conn. 2008)).

A State's duty to evaluate a student can be triggered by a request by the student's parents, the school district, or others. 20 U.S.C. § 1414(a)(1)(B). Once such a request has been made, the IDEA requires the State to conduct an initial evaluation of the student "within 60 days of receiving parental consent for the

evaluation" or within the timeframe established by the State if the State has established its own timeframe. See 20 U.S.C. § 1414(a)(1)(C)(i)(I); 34 C.F.R. § 300.301(c)(1)(i)-(ii). Connecticut regulations require that "[s]pecial education and related services shall be provided as soon as possible after the planning and placement team meeting held to review, revise or develop the child's individualized education program" and, in any event, an IEP shall be implemented within 45 school days of "referral or notice, exclusive of the time required to obtain parental consent." Conn. Agencies Regs. 10-76d-13(a)(1), 10-76a-1(5) ("'Days' means school days unless otherwise specified.").

In accord with other Courts of Appeals, we consider a violation of the Child Find obligation a procedural violation of the IDEA. See D.K., 696 F.3d at 249; D.A. ex rel. Latasha A. v. Houston Indep. Sch. Dist., 629 F.3d 450, 453 (5th Cir. 2010); Bd. of Educ. of Fayette Cty. v. L.M., 478 F.3d 307, 313 (6th Cir. 2007); see also Handberry v. Thompson, 446 F.3d 335, 347 (2d Cir. 2006) (observing that the "Child Find provisions of the IDEA" require States to adopt certain "policies and procedures" (internal quotation marks omitted)).

To hold a school district liable for failing to identify a student who should be evaluated for purposes of receiving special education, a "claimant must show

that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate." L.M., 478 F.3d at 313 (internal quotation marks omitted); see J.S., 826 F. Supp. 2d at 661; Reg'l Sch. Dist. No. 9 Bd. of Educ. v. Mr. & Mrs. M., No. 07-cv-1484, 2009 WL 2514064, at *11 (D. Conn. Aug. 7, 2009). A school district must begin the evaluation process within a reasonable time after the district is on notice of a likely disability. See Dallas Indep. Sch. Dist. v. Woody, 865 F.3d 303, 320 (5th Cir. 2017) ("School districts must seek to evaluate students with suspected disabilities within a reasonable time after the school district is on notice of facts or behavior likely to indicate a disability."); D.K., 696 F.3d at 250 ("We have inferred a requirement that schools identify disabled children within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability." (internal quotation marks and brackets omitted)).

The district court correctly concluded that, because the parents requested a Due Process Hearing on March 24, 2014, and because of the two-year limitations period for IDEA claims, "[e]vents preceding March 24, 2012 are untimely but may provide evidence of a child-find violation from March 24, 2012 through June 11, 2012, when [M.P] was deemed eligible for special education." Mr. & Mrs. P.,

2016 WL 5660389, at *7; 20 U.S.C. § 1415(f)(3)(C); Conn. Agencies Regs. 10-76h-4(a), (b).

The parents first referred M.P. for special education in March 2012. A PPT meeting was convened on March 12, 2012 to consider the parents' referral and determine M.P.'s eligibility for special education. During that PPT meeting, school officials acknowledged that M.P. was experiencing severe anxiety, but the parents reported that M.P.'s medications were beginning to help. Because M.P. had not been experiencing problems "over a long period of time," the school officials determined that M.P. did not then meet the criteria for the disability of emotional disturbance. A.A. 345. The district court found that this decision was reasonable, concluding that "[t]he Board's decision to continue monitoring [M.P.] from March 24 until April 23 to determine whether [M.P.'s] condition was long lasting as required for special education eligibility, and then to initiate the evaluation process, was supported by a preponderance of the evidence." Mr. & Mrs. P., 2016 WL 5660389, at *8. We agree.

The determination by the Board to continue monitoring M.P. was reasonable because, under the IDEA, "Emotional disturbance means a condition exhibiting [certain] characteristics over a long period of time and to a marked

33

degree that adversely affects a child's educational performance." 34 C.F.R. § 300.8(c)(4)(i). As of the March 12 meeting, M.P. had only recently stopped attending Hall and begun homebound tutoring. The District had no new evidence suggesting that M.P. had a disability of emotional disturbance, and the District continued to provide homebound tutoring for M.P. as part of its Section 504 accommodations. It was reasonable for the PPT to proceed deliberately when weighing whether a tenth grader, who had previously done well in school, should be enrolled in special education. This caution was reinforced by the parents' own reluctance to give the District access to M.P.'s psychiatric records.

When the PPT reconvened on April 23, 2012, M.P. had just been hospitalized a second time for emotional issues. This hospitalization -- M.P.'s second since he began having problems in December -- created a reasonable suspicion that M.P. might require special education, and the PPT began the initial evaluation. Although the parents were withholding a release for M.P.'s psychiatric records "until they ha[d] a better understanding of what is going on with [M.P.,]" the PPT recommended a psychiatric consultation with the District's psychiatrist. A.A. 348. Within three weeks, M.P. had met with the District's psychologist and psychiatrist. The PPT met to review the reports from the

psychologist and psychiatrist on May 17, 2012 and continued M.P.'s homebound

tutoring.[9] At its meeting on June 11, the PPT found M.P. eligible for special

education.

In sum, the District initiated an evaluation of M.P. at the April 23 meeting

and recommended M.P. for special education by June 11, about a month and a

half later. Once the District's psychologist recommended the District "explore the

possibility of a special education mandation under the category of Emotional

Disturbance," A.A. 352, and the District's psychiatrist suggested STRIVE as an

option, the PPT held one more meeting on May 17 "to review recommendations

from the psychiatric consult and determine the correct placement for the

---

[9] The parents argue that the District violated Connecticut's requirement that an IEP be implemented within 45 school days of "referral or notice." See Conn. Agencies Regs. 10-76d-13(a)(1). However, where a student is receiving "alternative procedures and programs in general education" as M.P. was following the Section 504 meeting in January 2012, Connecticut regulations only require a school to accept the parents' referral and meet "to consider the referral to determine if an evaluation of the child is appropriate." Conn. Agencies Regs. 10-76d-7(b). School officials convened a meeting on March 12, 2012 to review the parents' referral to determine M.P.'s eligibility for special education, in compliance with Connecticut regulations. Because school officials determined that special education was not appropriate for M.P. at that time, and because IEPs are only used for students with a disability, see Conn. Agencies Regs. 10-76a-1(10), there was no requirement that the school implement an IEP within 45 school days of the parents' referral.

remainder of this year," id. at 357. At that point, the school had still not received any private evaluations of M.P. Three weeks later, at the June 11 meeting, the PPT determined that M.P. was eligible for special education. The District acted reasonably: it provided M.P. with immediate support and accommodations when he began having trouble in December; it ordered a psychological evaluation and psychiatric consult when M.P.'s trouble persisted; and it found M.P. eligible for special education a month after the evaluation and consult were complete. All told, three months -- during which time there were three PPT meetings, a psychological evaluation, and a psychiatric consult -- intervened between the time the parents initially referred M.P. for special education and the meeting where the district found M.P. eligible. We therefore agree with the district court that the District acted with sufficient expedition once it had a reasonable suspicion that M.P. might require special education. See D.K., 696 F.3d at 250-51 & n.6 (holding that the "mere procedural noncompliance" the school district exhibited by failing to evaluate the student within sixty days of receiving permission from the parents did not amount to an "unwarranted

delay" or entitle the student to compensatory education).[10] The District did not violate its Child Find obligation.

## ii.

The parents also argue that the District failed to conduct a sufficiently thorough evaluation of M.P. once the District suspected M.P. might have a disability. The district court rejected this argument, upholding the Hearing Officer's determination that, given that M.P.'s suspected disability was emotional disturbance, the psychological evaluation and psychiatric consultation the District conducted were sufficiently thorough. We agree.

The parents argue that the District's evaluation was insufficiently thorough because it overlooked M.P.'s diagnosis of Asperger's Syndrome and his demonstrated weakness in writing. The IDEA required the District to assess M.P.

---

[10] The parents requested special education services in March 2012, and the PPT found that M.P. qualified for special education at its June 11, 2012 meeting. While more than sixty days elapsed between the date of the parents' request and the date of the determination, the time prior to April 23, 2012 was properly excluded because the PPT had reasonably concluded at its March 12, 2012 meeting that M.P. was not eligible for special education at that time. In any event, there is no showing that any procedural violation occasioned by the failure to find M.P. eligible for special education about thirty days earlier constituted the denial of a FAPE, particularly in view of the fact that the District continued to provide M.P. with Section 504 accommodations, including homebound tutoring.

37

in all areas related to his suspected disability. See 34 C.F.R. § 300.304(c)(4). The parents requested that the PPT find M.P. eligible for special education based on his emotional disability. At its April 23 meeting, the PPT was faced with evidence of psychiatric hospitalization and aggressive ideation, leading the PPT reasonably to seek to evaluate M.P.'s emotional issues. Academics were not a concern and therefore cognitive testing was not requested. But the PPT directed a thorough psychological examination, which included behavioral testing and a psychiatric consultation. The PPT ultimately concluded that M.P. was eligible for special education based on the primary disability category of emotional disturbance.[11] The district court reasonably concluded that the "[t]he Hearing Officer's determination that the PPT's assessment was sufficiently thorough is supported by a preponderance of the evidence." Mr. & Mrs. P., 2016 WL 5660389, at *8.

---

[11] Dr. Black concluded in his psychiatric consultation for the District that M.P. probably met the DSM IV Axis I criteria for Asperger's Disorder. The DSM V provides that Autism Spectrum Disorder encompasses disorders previously referred to by other disorder names, including Asperger's Disorder. The IDEA regulations do not contain a separate category for Asperger's Disorder but do contain categories of disabilities for Autism and emotional disturbance.

The IDEA regulations provide that "Autism does not apply if a child's educational performance is adversely affected primarily because the child has an emotional disturbance . . . ." 34 C.F.R. § 300.8(c)(1)(ii).

While the parents contend that M.P. had a demonstrated weakness in writing, assessments of M.P. contemporaneous with his evaluation for special education determined that he was "[s]trong academically," A.A. 363, and the parents' private psychologist determined that M.P. had average writing skills. Moreover, the parents cannot point to any negative impact the District's evaluations had on M.P.'s education. M.P. scored in the "Goal" range for writing on the state-wide CAPT during his junior year at STRIVE, and M.P.'s special education teachers testified about his improvement in writing and the specific strategies they used to help M.P. improve his writing. The District conducted an adequate evaluation of M.P., and M.P.'s education was not adversely affected by the evaluation.

**iii.**

The parents also argue that the District committed a procedural violation by providing M.P. with insufficient homebound tutoring. The Hearing Officer agreed because the homebound tutoring provided to M.P. during the second semester of his sophomore year was "inconsistent in terms of duration of sessions and number of sessions per week." Special App. 15. However, the Hearing Officer determined that M.P. was not denied any educational benefits,

39

nor were the parents denied the opportunity to participate in the decision-making process, by these inconsistencies. The district court found that the Hearing Officer's conclusion was supported by a preponderance of the evidence. Mr. & Mrs. P., 2016 WL 5660389, at *11. We agree. While the record suggests that the District fell behind on M.P.'s tutoring, the District provided compensatory tutoring hours to make up for missed time, which allowed M.P. to meet the requirements to advance from the tenth grade. The District's violation did not adversely affect M.P.'s education or hinder the parents' opportunity to participate in the decision-making process.

## iv.

The parents also allege that the District committed a procedural violation by failing to consider the report of the parents' private neuropsychologist, Dr. Isenberg, at the September 20, 2013 PPT meeting. That meeting was convened "to review a [neuropsychological] evaluation administered by Dr. Isenberg," although it is not clear from the meeting minutes what, if any, substantive discussion was devoted to the report. A.A. 408.

While the IDEA required the District to consider this neuropsychological report, the District was not required to implement Dr. Isenberg's suggestions. See

40

34 C.F.R. § 300.502(c)(1). In the context of both the IDEA and Connecticut's implementing regulations, this Court has previously noted "that the regulatory requirement for an [independent evaluation] to be 'considered' by a public agency does not mandate 'that there be substantive discussion' of the [independent evaluation]." T.S. v. Bd. of Educ., 10 F.3d 87, 90 (2d Cir. 1993) (per curiam) (quoting G.D. v. Westmoreland Sch. Dist., 930 F.2d 942, 947 (1st Cir. 1991)). In any event, the Special Education Supervisor at STRIVE testified that he reviewed the independent educational evaluation ("IEE"), attended the PPT meeting, and commented on the IEE during the PPT meeting. Based on such facts, the IEE was adequately "considered" in accordance with the IDEA and Connecticut regulations. See id. (noting that "an IEE had been adequately 'considered' when it was read by the public school's director of special education" (citing Evans v. District No. 17, 841 F.2d 824, 830 (8th Cir. 1988))). The District thus did not commit a procedural violation relating to Dr. Isenberg's report.

### v.

The Hearing Officer found that the District committed a procedural violation by drafting inaccurate and incomplete IEPs but concluded that this did

not cause a detriment to M.P.'s educational progress or interfere with meaningful participation by his parents. The district court deferred to the Hearing Officer's determinations. Mr. & Mrs. P., 2016 WL 5660389, at *10. The parents point to nothing in the record to overcome the deference we give to well-reasoned administrative findings, such as those in this case. Walczak, 142 F.3d at 129 ("Deference is particularly appropriate when, as here, the state hearing officers' review has been thorough and careful."). Moreover, the parents fail to explain the impact of any inaccuracies on their ability to participate meaningfully in the IEP process or on M.P.'s educational benefits or right to a FAPE. R.E., 694 F.3d at 190 (procedural violations result in a violation of the IDEA only "if they impeded the child's right to a [FAPE], significantly impeded the parents' opportunity to participate in the decisionmaking process, or caused a deprivation of educational benefits." (internal quotation marks omitted)). As a result, we find no basis upon which to reverse the Hearing Officer's conclusions. See Walczak, 142 F.3d at 129-30.

**vi.**

The parents argue that the absence of a regular education teacher from Hall at the May 22, 2013 PPT meeting was a procedural violation. The IDEA

requires that the PPT include a regular education teacher, and the regular education teacher must attend PPT meetings unless excused by the consent of the parents. 20 U.S.C. §§ 1414(d)(1)(B), (d)(4)(B). No regular education teacher attended the May 22, 2013 meeting. Among the eight attendees were M.P.'s guidance counselor from Hall, his special education teacher from STRIVE, two other STRIVE staff members, and a social worker.

The mere absence of a regular education teacher at any given IEP meeting is not a per se procedural violation. The relevant inquiry with regard to this claim is whether M.P.'s regular education teacher attended the IEP meetings "to the extent appropriate." See 20 U.S.C. § 1414(d)(3)(C). At the time of the May 22, 2013 meeting, M.P. had not attended Hall in nearly a year and a half, and had been enrolled at STRIVE for almost a full year. The parents point to nothing suggesting that, had a Hall teacher been present, the teacher could have provided meaningful input into the development of the IEP for M.P. In fact, at the PPT meeting on February 4, 2014, the parents excused the presence of a regular education teacher. The absence of a regular education teacher at the May 22, 2013 PPT meeting did not rise to the level of a procedural violation of the IDEA.

The parents also contend that the District's failure to provide the parents with a copy of the IEP developed at the May 22, 2013 meeting for six months, which the Hearing Officer and the district court agreed was a procedural violation by the District, denied them a meaningful opportunity to participate and denied M.P. a FAPE. The district court observed that the parents had attended every PPT meeting and did not allege that they were unaware of any programming selected for M.P., and the violation therefore was not substantive. Mr. & Mrs. P., 2016 WL 5660389, at *10. We agree with the district court that the parents have not shown how this procedural violation impeded M.P.'s education.

The parents also contend that the failure to provide them with the IEP developed at the May 22, 2013 meeting in a timely fashion amounted to a denial of their opportunity to participate in the decision-making process. The parents assert that an e-mail Mrs. P. sent to school officials on October 17, 2013 expressing "concern that [M.P.] may not be receiving support during his time at Hall[,]" shows that the parents thought M.P. was receiving support that he was not receiving while transitioning back to Hall. A.A. 566-67. However, Mrs. P.

testified that she agreed with the outcome of the May 22, 2013 meeting, and that "[a]t that point, I felt that [M.P.] was stable enough to try to transition back for a partial day." Supp. App. 161. Mrs. P. also testified that the determination of which classes M.P. would take at Hall occurred at the meeting, that she steered the team away from a class she felt would be too stressful for M.P., and that the team agreed and altered M.P.'s schedule based on her input. Thus, the record supports the conclusions of the Hearing Officer and the district court that the District's procedural violation did not have a detrimental effect on M.P.'s education or deny the parents an opportunity to participate in the decision-making process. See R.E., 694 F.3d at 190 (noting standard required for procedural violations to rise to the level of denying a FAPE).

### viii.

The parents also contend that the District failed to provide the qualifications of the paraprofessionals who would work with M.P. at ACHIEVE and that this was a procedural violation, which denied M.P. a FAPE and denied the parents an opportunity to participate in the decision-making process. The parents cite no authority for the proposition that the District was required to provide them with the specific qualifications of the paraprofessionals at a

45

proposed post-secondary program. This Court has previously observed that a school district cannot establish a FAPE based on the reasoning that a "specific teacher would have been assigned" because the district "cannot guarantee that a particular teacher or aide will not quit or become otherwise unavailable for the upcoming school year." R.E., 694 F.3d at 187. The same analysis applies when challenging the school district's proposed program: Rather than focusing on the qualifications of the paraprofessionals expected to staff the program, "[t]he appropriate inquiry is into the <u>nature of the program actually offered in the written plan</u>." <u>Id.</u> (emphasis added). Although M.P. declined to attend ACHIEVE's orientation, Mrs. P. toured the ACHIEVE facility with Ms. Pettinelli, ACHIEVE's coordinator. <u>Mr. & Mrs. P.</u>, 2016 WL 5660389, at *12. Ms. Pettinelli attended the June 2, 2014 PPT meeting, explained the ACHIEVE program to the parents, and answered questions from the parents' attorney. The parents rejected ACHIEVE and the summer transition program proposed by the District at the same meeting, and there is thus nothing to indicate that the District's failure to provide the specific qualifications of the paraprofessionals impacted the parents' decision.

Moreover, the record supports the district court's conclusion that withholding information regarding the paraprofessionals at ACHIEVE "is not symptomatic that ACHIEVE was not a substantively appropriate program." Mr. & Mrs. P., 2016 WL 5660389, at *10. Ms. Pettinelli testified that one of the paraprofessionals at ACHIEVE had been with the program for 14 years and another for eight years, that some paraprofessionals had 25 years' experience in post-secondary programs in West Hartford, and that she had personally worked with several students with similar Autism/psychosis diagnoses as M.P.

The parents' contention that the District's failure to provide specific details about ACHIEVE's staff beyond those conveyed by Ms. Pettinelli and available at the orientation is without merit, and the District did not commit a procedural violation on this basis.

### ix.

We also agree with the district court and the Hearing Officer that the District's procedural violations did not impede M.P.'s right to a FAPE, hinder the parents' opportunity to participate in the decision-making process, or otherwise deprive M.P. of education benefits, even when considered cumulatively. See R.E., 694 F.3d at 190; 20 U.S.C. § 1415(f)(3)(E)(ii). The District violated the procedural

requirements of the IDEA by providing inconsistent tutoring in the summer before M.P. enrolled at STRIVE, by creating inaccurate and/or incomplete IEPs, and by failing to provide the parents with a timely copy of the May 22, 2013 IEP. However, "none of [these procedural violations] affected the substance of [M.P.'s program, so] this is not the rare case where the violations, when taken together," resulted in a denial of a FAPE. A.M., 845 F.3d at 541.

**B.**

The parents also challenge the substantive adequacy of the programs that the District provided to M.P., beginning with the homebound tutoring and accommodations made during the second semester of M.P.'s sophomore year at Hall in 2012, through the District's proposed post-secondary program for the 2014-2015 school year at ACHIEVE. The Hearing Officer found that each program provided or proposed by the District, with the exception of the transportation proposed for M.P. at ACHIEVE, provided M.P. with a FAPE. The district court examined each of these findings and sustained the Hearing Officer's determinations. Mr. & Mrs. P., 2016 WL 5660389, at *10-14.

We agree with the district court that the record supports the substantive adequacy of the education programs provided to M.P. through his senior year

and offered to him thereafter. However, it is necessary to clarify the standard for

evaluating the substantive adequacy of an education program under the IDEA in

light of the Supreme Court's recent decision in Endrew F.

The district court described the standard for reviewing a substantive

challenge under the IDEA as follows:

> To establish a violation of the IDEA's substantive requirements, a party must show that the revised "individualized education program developed through the Act's procedures" was not "reasonably calculated to enable the child to receive educational benefits." See Rowley, 458 U.S. at 206-207. In reviewing this claim, the Court must keep in mind that a district is not required to furnish "every special service necessary to maximize each handicapped child's potential." Id. at 207; [Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 196 (2d Cir. 2005)]. "Instead, the IDEA is satisfied if the school district 'provides an IEP that is likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" [A.S. v. Trumbull Bd. of Educ., 414 F. Supp. 2d 152, 173 (D. Conn. 2006)].

Mr. & Mrs. P., 2016 WL 5660389, at *11.

In Endrew F., decided approximately six months after the district court's

decision in this case, the Supreme Court rejected the contention that the IDEA's

substantive requirements were met where the student had received an

"educational benefit that is merely . . . more than de minimis." Endrew F., 137 S.

Ct. at 997 (quoting Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. Re-1, 798

F.3d 1329, 1338 (10th Cir. 2015) (brackets omitted)). The Supreme Court reasoned that "[i]t cannot be the case that the [IDEA] typically aims for grade-level advancement for children with disabilities who can be educated in the regular classroom, but is satisfied with barely more than de minimis progress for those who cannot." Id. at 1000–01. Rather, the Supreme Court held that "[t]he IDEA demands more. It requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Id. at 1001 (emphasis added).

Prior decisions of this Court are consistent with the Supreme Court's decision in Endrew F. Hence, this Court has emphasized that the substantive adequacy of an IEP is focused on whether an IEP was "reasonably calculated to enable the child to receive educational benefits" and "likely to produce progress, not regression." A.M. 845 F.3d at 541. In Walczak, this Court explained that, while the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP," "the door of public education must be opened for a disabled child in a 'meaningful' way. This is not done if an IEP affords the opportunity for only trivial advancement." 142 F.3d at 130 (quoting Rowley, 458 U.S. at 192 (internal quotation marks and citations

omitted)). Merely crossing the threshold of "trivial advancement" does not satisfy the IDEA, as the Walczak court and the Supreme Court have explained.[12]

We affirm the judgment of the district court because the record indicates that the District provided M.P. with a meaningful educational program that was reasonably calculated to enable M.P. to make progress appropriate in light of his circumstances. Endrew F., 137 S. Ct. at 1001. After M.P.'s first hospitalization, the District made several accommodations: allowing M.P.'s teachers to give a "P" for low grades, having no penalty for late work, and providing staff and a resource study hall to help M.P. handle his coursework. When M.P.'s problems persisted

---

[12] This Court's decision in Cerra does not stand for the proposition that the IDEA is satisfied with any progress above the floor of "trivial advancement," and it should not be cited for that proposition. In Cerra, this Court stated that "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" 427 F.3d at 195 (quoting Walczak, 142 F.3d at 130). However, in Cerra the State Review Officer found that the student had made meaningful -- not simply more than trivial or de minimis -- progress when she took advantage of the services offered to her, based on her passing grades, progress reports, teacher testimony, and formal evaluations. Id. at 195-96. Likewise, in Walczak, cited by Cerra for this statement, this Court observed that the student's "objective academic achievements are uncontradicted and certainly not 'trivial.' In fact, they are impressive when considered in light of the significant social problems that impeded [the student's] academic progress . . . ." Walczak, 142 F.3d at 131. Thus, Cerra should not be read or cited for the proposition that anything more than "mere trivial advancement" is sufficient to satisfy the IDEA.

and manifested as a refusal to attend school, the District provided homebound tutoring.[13] While it appears that the District initially provided too few hours of homebound tutoring when M.P. first began experiencing problems during his sophomore year (and before he was found eligible for special education), the District promptly recognized this and provided compensatory tutoring hours during the summer, which enabled M.P. to advance from the tenth grade. This was not an insignificant achievement for M.P., who had been failing five out of his seven classes when the District first met with his parents and made the initial accommodations earlier that year.

The record also demonstrates that the District provided M.P. with a FAPE during his junior and senior years at STRIVE. While at Hall, M.P. failed to complete the state-wide CAPT. During his first year at STRIVE, M.P. not only completed the test, but did well, scoring Proficient in math and reading and Goal in science and writing. Not only did M.P. pass from grade to grade while at

---

[13] The District has defended the adequacy of the education provided to M.P. prior to March 24, 2012, although a challenge to that educational program is barred by the IDEA's statute of limitations, and M.P. was only determined to be eligible for special education and related services at the June 11, 2012 PPT meeting. The district court began its analysis of the substantive adequacy of the education with the homebound tutoring provided to M.P. in February 2012, and we therefore do the same.

STRIVE, he achieved mostly "As" and "Bs." As Mrs. P. acknowledged, by the end of his senior year, M.P. had met all of the Hall graduation requirements and could have chosen to participate in Hall's graduation. The PPT noted M.P.'s "continued progress academically and behaviorally" since entering STRIVE, including the fact that M.P. had close to a 3.0 GPA at graduation. A.A. 541. As the district court found, "the administrative record soundly supports the conclusion that STRIVE not only constituted an adequate education under IDEA, but that [M.P.] showed substantial academic and social improvement in the program." Mr. & Mrs. P., 2016 WL 5660389, at *12.

Mrs. P. testified that M.P. made social, emotional, and behavioral progress while attending STRIVE, and that she did not believe M.P. should have attended Hall during at least his junior year. While the parents believed that STRIVE was "not the ideal environment" for M.P., the parents told STRIVE staff that STRIVE assisted M.P. in many ways and that when M.P. returned to STRIVE after his failed transition back to Hall at the beginning of his senior year, it was "a huge relief to [M.P.] to be back [in] an environment where he feels more comfortable." Supp. App. 20. While the parents argue that STRIVE's curriculum was too easy for M.P., when the PPT planned for M.P. to take chemistry at Hall during his

senior year, the parents objected and "said that that was just ridiculous to take a child from such a structured environment and put him in to a high stress class like that, where you do have to have a lot of organizational skills to be successful." Id. at 161-62.

Attending STRIVE also enabled M.P. to participate in athletics at Hall, where he was on the wrestling team during his junior and senior years. His wrestling coach described M.P. as a "valued member of the team" who "others looked [to] for a funny quip when times were tough or practice was hard" and who "progressed from a rookie wrestler to one who competed and won a varsity spot his senior season." Id. at 21. The record reflects that STRIVE provided a structured, challenging environment that enabled M.P. to succeed and develop without overwhelming him. The parents, who did not object to M.P.'s placement in STRIVE until the second semester of his senior year, point to no alternatives that would have served M.P. better.

The parents contend that it is error to rely on M.P.'s grades as an indication of his progress. However, grades are an important indication of any student's progress. While not "every handicapped child who is advancing from grade to grade . . . is automatically receiving a [FAPE]," the Supreme Court has

54

explained that, when a child is mainstreamed in a regular classroom, "the system itself monitors the educational progress of the child." Endrew F., 137 S. Ct. at 999, 1000 n.2 (quoting Rowley, 458 U.S. at 203 n.25). In that context:

> Regular examinations are administered, grades are awarded, and yearly advancement to higher grade levels is permitted for those children who attain an adequate knowledge of the course material. Progress through this system is what our society generally means by an education. And access to an education is what the IDEA promises. Accordingly, for a child fully integrated in the regular classroom, an IEP typically should, as Rowley put it, be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.

Id. at 999 (internal quotation marks and citations omitted). While STRIVE is an alternative high school, not a regular education environment, "STRIVE's curriculum is aligned with that of the regular education [at] West Hartford high schools in terms of content." Special App. 7; see Walczak, 142 F.3d at 130 ("[T]his court has looked to test scores and similar objective criteria even in cases where a disabled child has been educated in self-contained special education classes."). One of M.P.'s teachers at STRIVE testified that "[t]he reading level was right on grade level. I mean, we were using the psychology book from Hall, the magazines, the Upfront Magazine, the online sources are all, you know, the same material that Hall is using. So, they're all grade level." Supp. App. 266. M.P. went

from a failing student at Hall who could not even complete the state-wide CAPT, to a mostly "A" and "B" student who scored from Proficient to Goal on the same test a year later at STRIVE. While not dispositive, M.P.'s steady and timely progression through each grade and his much improved grades and test scores indicate that he made substantial progress at STRIVE. The record thus strongly supports the district court's finding that the District provided M.P. with a FAPE during his junior and senior years.

The parents argue that ACHIEVE would not have provided M.P. with a FAPE and that M.P. should have been designated to attend Options instead. The parents spend considerable time arguing that Options is superior to ACHIEVE, but that is not the relevant inquiry. Rather, the relevant inquiry is whether the District's proposed placement for M.P., at ACHIEVE, was "reasonably calculated to enable [M.P.] to make progress appropriate in light of [his] circumstances." See Endrew F., 137 S. Ct. at 1001. That is because "courts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy,'" and thus "once a court determines that the requirements of the [IDEA] have been met, questions of methodology are for

resolution by the States." <u>Rowley</u>, 458 U.S. at 208 (quoting <u>San Antonio Indep. Sch. Dist. v. Rodriguez</u>, 411 U.S. 1, 42 (1973)).

In this case, the record supports the finding that, with the modification to provide private transportation, ACHIEVE was reasonably calculated to allow M.P. to continue to make progress in light of his circumstances. The Hearing Officer described ACHIEVE as "strikingly similar" to Options. Special App. 14. The thrust of the parents' argument is that ACHIEVE does not provide sufficient supervision of students at job sites or in the community, whereas Options provides a one-on-one job coach to each student. As the district court pointed out, the minutes from the June 2, 2014 PPT meeting specifically indicated that M.P. would have a one-on-one job coach at ACHIEVE. Moreover, STRIVE's staff, who worked with M.P. on a daily basis during his two years in the program, testified that, other than the single altercation when he defended a female student, M.P. never acted out physically or threatened anyone. As STRIVE's Program Coordinator put it, "[M.P.] wasn't someone that we had to stand over, if you will." Supp. App. 403. In any event, the Hearing Officer directly addressed the parents' safety concerns by instructing the District to provide M.P. with

private transportation to and from ACHIEVE and job sites until the PPT determined that M.P. was emotionally ready to begin bus training.

The parents also contend that Ms. Pettinelli's proposed program at ACHIEVE was insufficiently individualized because she did not interview M.P. or review his records. However, Ms. Pettinelli testified that she met with M.P.'s STRIVE teachers before drafting his proposed goals, and the district court found that the members of M.P.'s PPT, which adopted the goals in his IEP and recommended ACHIEVE, were "intimately involved" with his record. Mr. & Mrs. P., 2016 WL 5660389, at *13.

The record thus indicates that ACHIEVE, the District's proposed post-secondary program, was reasonably calculated to allow M.P. to make further progress in light of his circumstances.

**CONCLUSION**

We have considered the parents' remaining arguments and find them to be without merit. For the reasons explained above, the judgment of the district court is **AFFIRMED**.